Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nines, and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. All right, the first case we'll hear is Allen v. Cooper, and I guess we'll start with Mr. Park. Good morning, Your Honors, and may it please the Court. My name is Ryan Park from the North Carolina Department of Justice, and I represent the state of North Carolina and the other state defendants in this case. Congress enacted the Copyright Remedy Clarification Act using its general power to regulate copyrights under Article I of the Constitution. The Supreme Court later clarified that Congress may not authorize lawsuits against states using Article I. And since that time, every court that has considered the Clarification Act has ruled it unconstitutional. And the same is true of its close cousins in the patent and trademark spheres, which the Supreme Court itself struck down in 1999. The district court here disregarded this settled and uniform body of precedent, and in doing so, it misapplied the strict Section 5 test for an abrogation of immunity, a sovereign immunity, under the 14th Amendment. And it compounded that error by misapplying the other immunity doctrines that bar plaintiffs' claims against the individual defendants. For this reason, the state respectfully asks that the Court reverse the judgment below. Now, at the very threshold, Section 5 cannot apply here because Congress did not specifically invoke it when it enacted the Clarification Act. And as the Supreme Court has held for decades, there are special clear statement rules in the sovereign immunity context. And that includes that the rule that Congress, and this is from Pennhurst I all the way back in 1981, the very dawn of the modern sovereign immunity cases, that Congress must, quote, expressly articulate its intent to legislate pursuant to Section 5. And there is nothing of that sort here in the text of the statute or in the legislative history. And so I'd refer the Court to page 7 of the House report, page 8 of the Senate report. And on those pages, Congress says, we are enacting the statute under Article I. Now, it mentions the 14th Amendment, but only to contrast with its Article I powers. And for this reason alone, the district court's decision below was in error. And even if a special So you want us to go right directly to that, throw out the act, and you win and go home? Is that it? Well Does that dispose everything? So that would dispose of the claims against the state and the department, the entity claims. And then there are And what would that leave? So that would leave an issue that You wouldn't win. You don't win the case from that. No, no. The case would not I'm talking to you. Yes, exactly. So there is an issue that was not reached below, but was briefed below, about whether Ex parte Young would offer an alternative mechanism for pursuing these claims against the state officials who have been sued. I'm happy to address that, Your Honor. That wasn't addressed, though, you say. Well, so the district court didn't reach the question because it held that sovereign immunity had been abrogated, so it wasn't necessary. That would still be out there hanging. Exactly. Anything else would be out there hanging? Yes, so there would also be the personal capacity claims against the individual defendants. Qualified immunity issue. Exactly. So there's two claims that are pending. There's a declaratory judgment claim, which is barred by legislative immunity, and then there's an individual copyright infringement claim, which we believe is barred by Yes, Your Honor. Hold on. The district court I'm sorry. Go ahead. No, no. I was just going to contribute on that. I gather the district court did address the qualified immunity and the legislative immunity, but it did not address Ex parte Young. That's correct. That's correct. Go ahead. I was just going to ask where Ashwander comes in. Ashwander, Your Honor. Ashwander. It goes back into the 30s, I guess it is. But that spring court case says that courts don't resolve constitutional issues except as a last resort. Is there any of that in here? I don't believe so, Your Honor. I think that that presumption We don't have to throw out things on more than one basis. I was wondering if maybe there's some alternative to reaching this article, the 14th Amendment issue. So I don't think that it's actually possible to avoid that Section 5 issue. I think it's possible to avoid ruling on it. Well, I think the question is a little more nuanced. The question is, do we have to get into the statute and say it is not an abrogation and somehow say the statute doesn't stand? Can't we just do it on immunity and not get to the substance of the statute, just focusing on the statute to see whether there was an intent to abrogate immunity? I mean, sovereign immunity is a defense, right? That's correct. It's an affirmative defense. So I think the way to avoid that question, Your Honor, is to find that there's been no constitutional violation alleged here or there's been no well-pledged complaint. But I think Judge King's concern is to avoid holding the statute in any way unconstitutional. We don't need to address the statute itself. We just need to say the state in this case is immune, right? Yes, I see. So that's correct, Your Honor. That's 11th Amendment immunity. Right, right, right. The 11th Amendment applies to the entity claims, and then the qualified immunity would apply for the individuals. Yes, Your Honor. And so I'm happy to address qualified immunity. I think it's pending, and I think it's necessary to address that on appeal. And so there's two distinct reasons why. How much would qualified immunity knock out? We need to start there. You started with the constitutionality of the statute. You start at the other end. Qualified immunity, how much of the case we say that applies where it's been raised, how much of that case does it eliminate? So that would eliminate the entire case, qualified immunity. If we address qualified immunity and agreed with you, the case is over. I think that's right. I think that's what you said. I think that's right. Well, under Ex parte Young, wouldn't you still have some cause of action against the state? You're looking for injunctive and declaratory relief. Exactly, exactly. So it would address the claims to the extent that they pursue damages, and then there would be a request for an injunction and a declaratory judgment that Ex parte Young would need to cover. Let me ask you, the Ex parte Young wasn't addressed by the district court. It was pressed by the plaintiffs. And if we don't or can't address it, then it has to go back for that, right? I believe so, yes. So the question is, should we and can we address Ex parte Young? So I think, well, let me amend my answer to the threshold question, whether you have to consider it. I think that if this court holds that under qualified immunity there is no violation of law here, that that affirmative defense is on the face of the complaint, then I'm not quite sure you have to get to Ex parte Young. Would that eliminate the Ex parte Young issue? I thought Ex parte Young was an exception to ongoing violations of federal law.  That's correct, John. So, yeah, I actually haven't, I think that, okay, I think you do have to address the issue. So I haven't thought about that. So I'm happy to address Ex parte Young. Well, it's interesting to look at it, and I can tell you this, is do we have the tools to address it? I mean, there is a suggestion that the violation is ongoing. The complaint alleges six sites on the Web where you're arguably using the copyrighted materials. Right. But if you go to those six sites, anybody goes to those six sites, I understand my clerks again checked their six sites this morning, and they're all dead. Right. Are we allowed to look when the complaint alleges it, number one? And number two, is that sufficient to address the issue? So yes to both questions, Your Honor. So first, are you allowed to look? So the general rule is from Phillips, of course, a case from this court that we cited in our brief, is that any material that's integral to the complaint and is expressly incorporated in the complaint can be considered at this stage of the proceedings. And in that case, it was a newspaper article that was referenced and relied on. Well, they actually set forth the Web addresses in the complaint. Correct. And said this is where the violations, ongoing violations, are occurring. Correct. The question I'm asking is, can we then, when they invite us to that Web site, can we legitimately look and consider what we see? Yes, Your Honor, and that's exactly what this court did in Phillips. There was a newspaper article with the headline included in the complaint, and it was integral to the complaint. It related to a securities issue as to whether there was notice. And the court included an excerpt of that article in this court in its opinion because it was integral to the complaint and was expressly incorporated. And standing before you today, there's no dispute between the parties. Does that make it incorporated? Exactly, Your Honor. It does. That makes it part of the complaint. Yes, Your Honor. Yes, Your Honor. And, you know, standing before you today, there's no dispute between the parties that if for nearly two years those specific alleged infringements have been removed from the Web site. Isn't there an ongoing concern of future violation in that they've alleged in the complaint that there was a settlement agreement that the settlement agreement was not complied with? And they've also, by pointing to this North Carolina statute, which part of the plaintiff's argument, as I understand it, is that that statute is evidence of an intent to continue to use these copyrighted materials. Doesn't that suggest at least that there's a factual dispute that would require that the district court take a look at the whole record? So I don't believe so, and I'd like to make two points on that. So first, there is sovereign immunity and mootness, which I think this alludes to, are distinct limits on the scope of federal jurisdiction. And this has been confirmed by the DeBosch case and the Republic of Paraguay case that are cited on page 30 of our opening brief. And in those cases, it was a similar posture where the government had seized doing the challenged conduct, and the district court below said, well, that means it's non-moot under the Voluntary Cessation Exception. But this court didn't even consider mootness. And in Paraguay it said, because we consider sovereign immunity to be dispositive of the appeal, we're not going to consider other issues. And that was because Ex Parte Young requires an actively ongoing violation of law. That is happening right now. And Verizon, from the Supreme Court, says that that violation of law must be alleged in the complaint. And so, you know, new allegations that are alleged, you know, in a brief don't count. And the reason why this is okay are – there's a number of reasons why this is okay, and least of which is – Are you arguing that then the requirements for Ex Parte Young are stricter than the requirements generally for an injunction, which is capable of repetition, and it could happen. It's speculated it's not happening now. Right. You can get an injunction under that principle. But I guess under Ex Parte Young we're talking about jurisdiction. Exactly. And there has to be an actual ongoing violation. Exactly, Your Honor. Is that what your argument is? Yes, Your Honor. And where do we get that? So I would point the court to the DeBosch case, which Judges Niemeyer and King were on that panel. Did he write it or die? I believe he wrote. That was some kind of election. It was. It was. And so the issue was – About 20 years ago. That's correct. Good memory. Anyone else remember it? And Judge King dissented on part of it. Did he go along with it? He dissented on part of it, but not on this part of the case, Your Honor. And there were separate sections, and I joined part one, which addressed this issue, which is that, you know, an ongoing violation is required under Ex Parte Young. And there's no equitable exceptions, as there are in mootness. And I would also refer the court to a Seventh Circuit case that we didn't brief, but it's Watkins v. Blinzinger, and it's 789 F. 2nd 474. And that's a case where – You just talked about it, so maybe you didn't brief it. You came in here with the sign on you. Yes, this came up in our preparation for argument. And in that case, Judge Easterbrook and Judge Wood held, as we've stated, that a non-moot claim because of voluntary cessation can nevertheless be barred under Ex Parte Young. And the reason for this – there are a couple of reasons for this. So one is that, you know, mootness is a categorical bar to federal jurisdiction, but Ex Parte Young is not. It's one of many equitable exceptions, such as personal capacity suits. Yes, but Ex Parte Young is not dependent on mootness. Ex Parte Young is an exception to immunity. Exactly, Your Honor. Exactly, Your Honor. And so, you know, I would – in terms of getting to the substance of the ongoing violation, I think, you know, a dismissal under – for lack of subject matter jurisdiction is a 12B1 dismissal that is without prejudice. And it allows, you know, an amended complaint or a further lawsuit related to new alleged violations. But Iqbal requires that there be – and this is from the Chamber's decision from this court that we cited in our briefs. Iqbal requires that there be, you know, a specific – in the copyright context. This is from Chambers. You need to identify the copyrighted works, but you also need to identify specifically how those works were infringed and used without authorization. And there are six alleged infringements that meet that standard. But because those have all seized, Ex Parte Young is no longer a viable route. And so in terms of – if I may, I'd like to address the qualified immunity aspect. So there are two separate ways that qualified immunity applies. I think it would be – I think it's helpful for the court. I'd refer the court to page 87 of our joint appendix, which includes paragraph 16 of the contract. And in that contract, the department and Mr. Allen and his entity, Nautilus, agreed that the department could display this, quote, display noncommercial digital media. That's the quote from the contract. And there are a couple of requirements for that display. It terminates after five years. We're still in that five-year provision. But a reasonable official could look at that contract and say, well, we bargained for the right to make these types of displays. But isn't that a question of fact for the trial court to determine when he has a complete record? It would be a question of fact if the contract – if this court finds the contract ambiguous. Interpretation of a contract is a legal document. It's a legal question. We cited authority for that in our brief. And so if – so that contract, it was attached to the complaint. Isn't there an allegation that there may be some commercial aspect to the publication of these images? There is, yes. And that's a factual issue. So there is, but on the face of the complaint, it doesn't connect to the actual uses that were – of the works that were at issue here. So two points on that, Your Honor. So there's a vague allegation that there was some sort of financial relationship between the spouse of John Morris, who's the state deputy archaeologist, and an outside group that was designed to allow the outside group to produce educational videos about the QAR. But that – so the first point is that that occurred – that allegation occurred before the settlement agreement. And the settlement agreement, you know, explicitly says we are, you know, well, we are abandoning all claims that are presently pending. But the bigger problem is that there's no connection between that allegation of some sort of profit-making intent and the uses that are at issue here, which are free educational videos that the department produced to inform the public about the Queen Anne's revenge. And everyone agrees that the Queen Anne – the recovery of the Queen Anne's revenge is an important historical issue for the state, and that these videos – and that these videos – well, there's not an agreement on this legal proposition, but under this court's Bouchot case, that that type of historical use – Is North Carolina proud of Blackbeard? I mean, he was one of the worst of all, wasn't he? Well, I guess they're proud of – it's of immense historical interest, I'll say that. My elementary school daughter learns about it in school. The people who actually came and captured Blackbeard were from Virginia, so I guess that the kudos go to Virginia, who came and captured him. But yeah, it's a huge aspect of the state's history, and schoolchildren learn about it. There's a nonprofit museum that the state has established and generates a lot of interest from tourists visiting the coast. And these were just educational videos given for free, where a few seconds of Alan's footage were used. And on the final point before I sit down now is that a reasonable official could believe that that was fair use. So when I use copyrighted music at my wedding, that did not violate federal copyright law. That was fair use. And when I take a picture of my family at a museum, and there's copyrighted works in the background, that's fair use. I don't violate federal copyright law by posting that on social media. And that's essentially what happened here. They used some of Alan's images, which they believed in good faith they had a contractual right to use. And they put them in a historical video. So that's correct, Your Honor, but the question here is whether any reasonable official could have considered that fair use. Was there a reservation in the settlement agreement for use of the film for educational purposes? It didn't say educational. It said noncommercial. I'm sorry. What was the reservation? They had one under the public documents they reserved, and they had one for some kind of use. What was that? It was noncommercial digital media. That's what the parties agreed on. And that was reciprocal. So this is outside the record. But, you know, the department had its own videos, had its own footage. Most of the videos were department footage. And so both parties could use and display each other's noncommercial digital media. And so commercial media was subject to special arrangements that are not issued here. All right. You've got some rebuttal. Thank you, Your Honor. We'll hear from Mr. Gass, I think, next. Or Goss, is it? It's Gass, Your Honor. Andy Gass from Latham & Watkins on behalf of amicus Ralph Oman, the former register of copyrights. I want to begin by thanking the court and the parties for their consent to Mr. Oman having some time at this argument this morning. We appreciate it. This is a matter that he cares about quite deeply. I should say this. What troubles me a little bit is that your client is taking a position in the litigation as an actual factual matter, which is not normally the role of an amicus. I mean, you could have intervened. And it's a little troubling to have you arguing the merits of a proposition in this case. They've yielded five minutes, and I suppose we'll hear from you because we've granted it. But I can tell you that it's a little troubling, the role that you're playing. I mean, if you have an interest in this litigation, then the way to vindicate that interest is to intervene. But go ahead. Well, Judge Nemar, let me begin by clarifying what Mr. Oman's interest is here. So he, in fact, has no particular view in which party should prevail ultimately here. He certainly has no view on some of the questions that were the subject of your colloquy with Mr. Park about whether the constitutionality of the CRCA is an issue that needs to be addressed at all. Mr. Oman's sole interest here is in ensuring that the history of that act is accurately reflected to the extent that the court does reach the constitutionality of that statute. Beyond that, he doesn't particularly care one way or the other who ultimately prevails in the lawsuit. So with an eye toward that perspective, let me begin briefly by addressing one of the substantive points that Mr. Park made concerning the constitutionality of that statute, and then I thought it might be helpful to just spend a moment talking about what actually happened in the history. So Mr. Park began by suggesting that because Congress expressly invoked Article I in the legislative history of the statute, the court may not consider whether the statute was a valid exercise of its power under Section 5 of the 14th Amendment. I just want the court to be aware that that position has been expressly rejected in the context of the CRCA by the 11th Circuit. The case is National Association of Boards v. Board of Regents. That's 633 F. 3rd 1297 at 1315 note 30. I would add, by the way, that it's far less clear than Mr. Park has suggested that Congress, in fact, didn't rely on Section 5. I would refer the court to page 6 of the Senate report that he alluded to in which Congress noted that Fitzpatrick v. Bitzer was at that time the leading case concerning the constitutionality of abrogations under Section 5, and then went on in the next sentence to say Congress relied on the Fitzpatrick decision and the legislative history of the 76 Act to hold states liable for damage in copyright infringement cases. So if Congress was talking about that in the past, it's a bit hard to see why they wouldn't be interested in invoking the same source of authority in the future. Briefly, though, going back to the history, I just want to make clear that the cases to have addressed the constitutionality of the statute to date have painted a slightly misleading picture of the gravity of the problem that was confronting Congress at the time. From 1900 until the Supreme Court's decision in Atascadero in 1985, there were exactly four cases that wrestled with the question whether a state could be liable for copyright damages notwithstanding the 11th Amendment. Following the decision in Atascadero, there was an outbreak of five cases between 1985 and the date in 1988 when Mr. Oman filed the report that Congress asked him to submit. He, in that report, which took the Copyright Office nearly a full year to compile, Mr. Oman solicited comments from 44 stakeholders in copyright-related industries, including the testimony of a variety of rights holders who specifically identified instances in which states had in the past already willfully infringed their copyrights. Well, I think the record does appear to show that there's been a significant problem in this respect. But why would Congress not simply make it clear, knowing how the case law has evolved, that they were, in fact, passing this legislation under Section 5? Well, to be sure, their articulation of the constitutional source of authority they were invoking could have been clearer. I would note that in Congress's defense, the case law didn't become quite so clear until later, 1997, when the city of Burning got decided of what the precise requirements were to articulate the basis for Congress's power under Section 5. I see that I'm out of time. I don't want to waste the Court's time. Thank you, Your Honors. Finish answering her question, and then we'll sit. So the Congress's invocation of the sources of authority was perfectly consistent with the then-prevailing norms, given what the cases had established, but those standards changed as Justice Stevens' dissent in the Florida prepaid case. Yeah, but we can't supply the invocation. It seems to me that a prepaid Florida makes it pretty clear, unless Congress invokes the 14th Amendment explicitly. It can't be enforced under that. Your Honor. Relying on Burn, I think. Again, the 11th Circuit rejected that, and I would note that this Court… No, the 11th Circuit can't reject what the Supreme Court says. Well, this Court itself has noted in Brown v. North Carolina Division of Motor Vehicles, that's 166 F. 3rd 698 at 703, that Congress need not anywhere, quote, recite the words Section 5 or 14th Amendment in order to avail itself of Section 5. How do we address prepaid Florida, which is the Supreme Court case, and Burn, which explicitly talked about Congress's requirement to invoke those provisions in order to pass a statute that takes advantage of Section 5? Well, Your Honor, all of the resulting cases to have addressed the issue, including Chavez, by the way, which doesn't actually resolve the issue one way or the other, in fact, go on to assess the constitutionality of the CRCA under Section 5, notwithstanding the belief that Congress invoked only its Article 1 power. Again, I would… Thank you, Your Honor. Right. Is that all? May it please the Court, I am Susan Olive, appearing on behalf of Rick Allen and Nautilus Productions. Mr. Allen is with us today. I was going to focus on the constitutionality of the CRCA, but it appears to me you've got some questions about qualified immunity, that it might be better as a starting point. And with respect to qualified immunity in particular, the facts as the state represents them are not entirely congruent with the complaint because there are some assumptions that are made by the state that simply aren't in evidence as yet. Number one, the complaint is not limited to those six acts of infringement. If you look at the complaint itself, and for example… You're talking about an ex parte young issue now? Well, I'm talking about, I'm not talking about, yes, I'm talking about ex parte young in part. I'm also talking about qualified immunity and fair use, and they sort of go together. Qualified immunity turns on whether the state officials could have reasonably believed… That is correct. …that they were doing okay in publishing those excerpts under the settlement agreement. You're absolutely right. Okay, well, that doesn't go to those six websites that are listed in the complaint. You're right. Let me hit ex parte young for a sec because the complaint is not limited to those six websites. No, but let me… It's specifically… We're talking about an exception to qualified immunity, a constitutionally established immunity, and the requirements are pretty strict on it. There has to be an ongoing violation of federal law. So you allege in the complaint what you believe to be an ongoing violation of federal law, listing six sites and saying there are others. And so you look at the six sites and there's nothing there. And so now the question is, have you plausibly alleged an ongoing violation of federal law in that circumstance because the others is just a conclusory statement, which is not supported by the six sites? Now, maybe I'm wrong about the six sites, but we've checked it twice when we prepared for this case a while ago, and then we checked again this morning, and those sites don't have anything showing. Do you agree with that? I would agree that at those particular six sites the infringements are down. On the other hand, those same works… Well, the infringements are not. That's another question. I mean, you can argue they're infringements, but there are a few seconds apparently that may or may not be allowed by the contract but also could fall under fair use. We're not talking about the display of the whole film. These are sort of advertising teasers that talk about the shipwreck and the states interested in it, that type of thing. Well, actually, Your Honor, there's nothing in the complaint that sets out the length of Mr. Allen's films. The evidence would show, if we're allowed to go forward, that many of them are less than a minute long, one's 38 seconds, for example. When you take, as the state admittedly took, multiple seconds from something that's only 38 seconds long, it is very likely that the evidence will show that they have taken the heart, if not the majority, of what those films encompass. You're doing filming underwater. You don't have very long clips of those things that you do. By the time you've edited them down, taken out the dust, the sand, the things that you can't see and come up with a piece of work that is worth protecting. So they've taken multiple seconds out of an extremely short video clip. They have posted them. They originally posted them at six sites. About a year after the complaint was filed, they finally took down most of them. They finally got down, ultimately, by the time of the hearing or right shortly after the hearing, they had taken down all of them from those sites. But they keep, as the complaint alleges, engaging in ongoing infringements, what we allege are ongoing infringements, by reposting them at other locations on the Internet. And that is in the complaint that they are posting them not only at those sites, but on other locations. What sites can we go and look at? Your Honor, there's one in the, there are, there was one in the complaint, excuse me, in our reply brief that had an example of one that was posted as of the date of filing of our reply brief. And we had a clip from that that we put in our reply brief. If we went to that site today, would we see anything? No. It's come down, as I believe, between the filing of our reply brief and today. We can look right now on the web to find what you call alleged infringements. Yes, Your Honor. Give us just a minute. I can have my colleagues bring up that precise site. But what this shows is that this is an ongoing, unlike the case that was discussed earlier with the political campaigns, where you had one instance, one isolated instance, where a political candidate was not permitted to participate in a debate. And as a result, it was held not likely to be repeated. Here you've got... See, that's my whole point in the questioning of the State, was that is a standard for mootness or injunctions. But we're talking about Ex Parte Young as an exception to sovereign immunity. The States have been allowed sovereign immunity under the 11th Amendment. And if you read Alden v. Maine, Justice Kennedy lays out how serious that is. These are treated as sovereigns, and they are entitled not to be sued if they don't want to be sued in federal court. That is true, Your Honor. And so Ex Parte Young makes an exception to that, which is a constitutional protection. And so there has to be a demonstrated ongoing violation of federal law. Or, alternatively, Your Honor, and the cases are pretty clear as cited in our reply brief, there is either an ongoing violation or there is a clear pattern that shows that this is going to continually recur and therefore requires intervention at this point. It is not purely you have to have it today, what you have to demonstrate is it is happening so often that it is clearly going to recur. This is not moot. It requires Ex Parte Young intervention. And that is the situation we would have here even if today they managed to get everything off the Internet. Because we have got the pattern of they take it down once, they pop it up in another site, they pop it up in another site, they pop it up in another site. It is an ongoing, repeated infringement, and they have even passed the law to help them make it easier. Under the settlement agreement, what uses are they allowed to put them up for? Research. And that is in the complaint in paragraph 40 of the complaint. It is set out in paragraph 21. They may retain for research purposes. And do they also retain the government records provision in the settlement agreement? Do you mean? Section 121.25 subsection B. No. In our opinion, they do not. I thought they explicitly reserved that right. Let me put it this way. The contract acknowledges the existence of the Public Records Act. The contract does not, however, give the government the right to use Mr. Allen's works in a way that is different from what the Attorney General's opinion told them they could do, which is you can't infringe copyrights. And that is in addendum B to our initial brief. There is an opinion from the Attorney General to the Department of Cultural Resources that says the Public Records Act is not trumped by copyright. So the only use that is permitted under the contract is the one that is set out in paragraph 21, which is for research purposes. Now, there is a reference, as Mr. Clark mentioned, to noncommercial video. That was not saying any noncommercial video use is okay. It was saying for research purposes only you can use this. Sticking it up on YouTube is not a research purpose. I'm sorry, it's just not permitted under the contract. Now, that may be an issue of fact that ultimately the court has to decide, but I don't think that a reasonable person would look at what they've done, advertising a state museum, posting stuff to further advertise other activities and say this is a research use. It simply isn't. So if the museum is thought to be a research device, having young kids in the public learn about the ship and Blackbeard, the posting of advertising for the museum is not research? It's still not research. That is correct, John. If a museum is considered research, in other words, it's considered part of the educational process of the state and the schools, I gather you're segregating that they can't promote that. I am segregating that they can't use this as an advertisement for a museum that in our view is not research. It may be educational, but educational use is not permitted. Research use is what was permitted by the contract. Well, educational is usually permitted under fair use. Educational use in limited circumstances may be permitted by fair use, but as you know, even an educational institution can't make multiple copies of something and start handing them out willy-nilly to the students. That was handled in the Kinko's case, where professor publishing was specifically outlawed by the Supreme Court. So I don't think that it is or can reasonably be believed to be, given that contract, a fair use here. And I don't think, too, that a reasonable person in the position of these officials, which means they knew there had been a settlement agreement that settled allegations of copyright infringement. They knew that this work belonged to Mr. Allen. There was no question about it, no ambiguity about it. They knew he owned the copyrights. They knew that ordinarily the copyright law prevents copying. They knew that the Public Records Act did not immunize them because the Attorney General had told them that. They knew, although it's not in the record, they knew at least that they had taken multiple seconds how they worked. Pardon? The Attorney General could have been wrong on whether they were immunized or not. You are right. The Attorney General could have been wrong, but the advice that they got from the Attorney General is what a reasonable official would rely on. The reasonable official would not say, the Attorney General is wrong, I'm going to pay no attention to him, I'm going to go out and do my own research, which is going to come up with a result entirely different from what they told us in a question that we specifically posed to them. I think it's unlikely that the Attorney General was wrong on that point because copyright preemption has always been held to forbid state action of this sort. If you look at Section 201 of the Copyright Act, which dates back to the 1976 Copyright Act, itself the product of ten years of negotiation between the states and private individuals, Section 201E of the Copyright Act specifically says that no government can take copyrights from any individual. Involuntary transfers are prohibited. That was there even before the Copyright Remedy Clarification Act added Section 511 and the additional language to 501 saying states can't infringe. Can I ask you a question about the Ex parte Young? Yes, sir. What kind of an injunction would you have under Ex parte Young if you were allowed to have an injunction? Who would it be addressed to and what would it say? It would be addressed to the defendants here. Okay, and what would it say? It would say that they cannot enforce the invalid Public Records Act. None of these defendants are enforcers. You don't have the Attorney General as a defendant, and we said in JUTO that in order to have an Ex parte Young exception, again applying the strictness of it, you have to have as defendants the people who would actually enforce it. It does no good to tell some official in the Department of Records or the Department of the Museum or something that they have to enforce something when they don't have enforcement power. Well, my recollection, and we can amend the complaint if we have to, Your Honor, and if you need to send it back to us. In the current situation, whether Ex parte Young is available in the current complaint. Our understanding is that the defendants who are named here are in fact the ones that would be the plaintiffs in an action to enforce this statute. Who is the enforcer? Pardon? Give me the name of the person you think is the enforcer of an injunction against the state. I think that the Department of Cultural and Natural Resources is an enforcer of those rights. Are they allowed to bring suit on behalf of the state? I understand that they are, Your Honor. Now, if you look back at the case that was argued in January, the PETA case, that same issue arose there and the same issues were derived here. It has to be authorized by statute, doesn't it? Pardon? Their right to enforce has to be authorized by statute. I thought that was the Attorney General. That would be correct. Well, the Attorney General acts on behalf of the state. Yeah, but that's the enforcer. That's who you have to direct to enforce something. My personal... I mean, that's what we said in Hutto, right? In Hutto, I'm not sure that that is exactly what you said. I'll address that in my response, if I may, Your Honor. Let me ask you a procedural point. The state people started this appeal as a collateral order, right?  That is correct. Yes. Claims of immunity, various claims of immunity, and then you filed a cross-appeal. That's correct. Is there any jurisdictional problem with that cross-appeal? We don't think so, Your Honor, because among other things those issues are so inextricably intertwined that I think both parties have believed and do believe that there is jurisdiction here with respect to those issues. So you think the state agrees with you that there's a jurisdiction for the cross-appeal? I believe so, Your Honor. They certainly haven't raised it in their brief. If you and the state agree on that, you don't confer jurisdiction. That is absolutely correct. So there is a jurisdictional question that we have to first resolve... That is correct. ...with respect to the cross-appeal because a collateral order appeal doesn't normally create jurisdiction for everything else. That would be correct, Your Honor. That would be correct. All right. I see my time is up. I see you have some kind of rebuttal. Yes. I don't know which. I guess it's on your cross-repeal? Yes, sir. Your rebuttal. Okay. We'll hear now from Mr. Park. Thank you, Your Honor. So I'd like to start with the Attorney General's opinion that was the subject of the previous colloquy. So that's addendum B of Mr. Allen's opening brief. Now, that opinion states, as is obvious, that the public records law cannot trump federal copyright law, and so any copyrighted material cannot be released if doing so would violate federal law. And I think what's critical there is that federal copyright law allows use of copyrighted works with authorization. And that's what the Attorney General's opinion says. It says you cannot release these sound recordings, in that opinion, without permission from the copyright holder. And that is consistent with what a reasonable official looking at this agreement would believe, that they had permission, that the Department had bargained for permission to use these works. And I don't think that, at least on the face of the contract, it's right to say that their use of the works was strictly limited to historical research. The section says media and access passive, and it sets out a process by which all the parties to the agreement could give media access, could use the works and post them on their websites, and with certain conditions. You know, it said that there had to be a time stamp, had to be Nautilus, Mr. Allen's company, wanted a watermark of his company on the images, and it had to be on certain websites. Now, Mr. Allen's business partner has sued the state for a breach of contract, and that lawsuit is pending in state court, and saying that the state breached these agreements. But in that lawsuit, he never claims that the use was entirely prohibited. He says that, you know, by posting this stuff on third-party websites and by not including a watermark on certain images, the state had breached the contract. But it isn't assumed in that litigation that the parties had agreed to what the contract says, which is that they're allowed to use each other's images for non-commercial purposes. I'd like to address also the Ex parte Young issue and the threat of enforcement. So there's no genuine threat of this law being enforced against Mr. Allen and his company. So this is what Ex parte Young itself says. It says that, essentially, this is not only an exception to sovereign immunity. It's an exception to standing, because it's just simply unfair to force a plaintiff to have to violate a statute that he believes is unconstitutional, suffer sanctions, and then challenge the statute in that way. And so what Ex parte Young says is when state officials threaten and are about to commence proceedings to enforce against the plaintiff an unconstitutional statute, then these standing bars and these sovereign immunity bars don't apply. But there is no state official who is threatening to enforce anything against Mr. Allen. If a state official, if the Department or the Attorney General authorizes the release of these public records, at that point there can be a challenge to that authorization. But that's not what applies here. And I guess that would apply if, past the scope of the five-year license in the contract, we continue to have these uses. And I would just say, standing before you today, the Department of Natural and Cultural Resources, in conjunction with the Attorney General's Office, has taken great lengths to identify and remove any of Mr. Allen's works from its own servers. We have stated below, I state here today, this is at Joint Appendix 249, we said, in open court, if Mr. Allen will come to us and identify all of the uses of his works that he believes are infringing, we will gladly remove them. And we'll do everything within our power to remove them when they're on third-party websites. The image that's in the reply brief was on a third-party website. We went to them and asked them to take it down, and they agreed to do so. We don't have control over that website. But, you know, these new infringements that are alleged in the briefing really expose the problem that is posed by, or the problem that Iqbal, the Verizon case from the Supreme Court, is trying to address. You know, it's not, we don't have a record for this court to evaluate whether the image that was included in the brief is fair use. I mean, we think it is. So the copyrighted work is, you've seen the image, I'm sure, it's a little girl looking at a museum exhibit, and then there's copyrighted work in the background of the exhibit, takes about 5% of the image. You know, we believe that's fair use. We believe it's authorized. But Mr. Allen, in his brief, didn't even say where that image was from. We had to scour the websites and ask all those people who administer the websites to find that image. We couldn't find it. I see my time is expiring, and I would ask for respect. What about the cross-appeal issue? Do you think there's jurisdiction for the cross-appeal? So I think we didn't agree with this issue. I think it's – You didn't move to strike or dismiss. Exactly. Why didn't you move to dismiss? We think there probably is jurisdiction. A qualified immunity appeal under the collateral order doctrine, which of course the foresight doesn't create a jurisdiction for everything. Well, that's correct, Your Honor. That's the rule. Correct. I agree. She's got to have a – get under some exception that she used the right term, inexplicably intertwined. Exactly. It has to be that. But your qualified immunity appeal, you appeal the denial of immunity, and you say you're appealing the deferral of a ruling. Now, I don't know of any law that says you can appeal the deferral of a ruling. It's jurisdiction. Oh. Anyway, I have this one. She says you agree that there's jurisdiction. Yes. So in terms of – Answer that yes, you agree there's jurisdiction. Yes, we believe so. I acknowledge it's a close call. On the deferral issue, if I could just address that. Close call. Okay. So on their – Make the argument there's not any jurisdiction. So there are two issues in the cross-appeal. There are the alleged waiver in the contract. That's at JA 90, Paragraph 32 of the agreement. It says – and they claim that that constitutes a waiver of our sovereign immunity. You know, it says breach of the agreement, and so we think it's limited to a breach of contract claims. But, you know, I think that is inextricably intertwined and are swint because they are saying that all this sovereign immunity business doesn't apply because we've waived it. I think that meets the standard. The second cross-appeal issue is the takings claim where the district court held that – then there's no federal jurisdiction for a takings claim other than the U.S. Supreme Court. And, you know, we agree with that. I think because the basis for dismissal of the takings claims was a sovereign immunity-based dismissal from the court's Hutto decision, we think it's intertwined enough with the rest of the immunity issues. I agree that that is a closer call because it's an entirely different claim, an entirely different basis for appellate jurisdiction. And if I could just answer briefly the other question pending on the deferral. So Judge Boyle said that he defers ruling on legislative immunity. But this court said in EEOC v. Washington Suburban that the point of legislative immunity, like qualified immunity, is to avoid the costs and distractions of litigation. And so a deferral is effectively denial. If every legislature could be sued for an unconstitutional statute, it seems to me we'd have a lot of suits against legislators. I agree. And the same is true of executive branch officials who are involved in legislation. All right. Thank you. Thank you, Your Honor. Do we have anybody? Ms. Olive, do you have some rebuttal? Is that? Okay. To answer your question. It seems to me that the two issues that you raised on cross-appeal, one is whether the contract provision is a waiver. It seems to me it's been pretty well addressed by the Supreme Court that it's not. Have you got any case where it says basically holding that you're liable means you're half-waived Eleventh Amendment immunity? Yes, Your Honor. We think that both Atascadero and Port Authority are on point for that. And in particular, Atascadero said that you look at the surrounding circumstances and from the surrounding circumstances you interpret the waiver. Port Authority went further than that. It has to be a clear waiver, though, unequivocal and unambiguous. I mean, we don't imply waivers of sovereign immunity. Well, Your Honor, that's why we're The court has repeatedly said that again and again. Well, Port Authority, Your Honor, specifically said of sovereign immunity. He can't come in and say I waive it. It still has to be a state waiver, a clear state waiver that's approved by the state. Yes, Your Honor. I think it's a very uphill argument you're making on that. Well, I think that's potentially correct. It would, of course, dispose of the entire case without having to go to the CRCA. But in my opinion, if you look at Port Authority, which says that you look not only at the precise, I mean, we've got something here, which is executed by the state. So the contract is executed by the state and the waiver is in it. Now, Port Authority What's the language that you allege is the waiver? Precise language. It is, let me pull it here, sorry. Well, I don't want to take all your time. We'll look at it. I know it, and I apologize for not having it immediately there. It's set out both in the complaint and in the brief itself. And it is in wording that in isolation has essentially been held not to be sufficient. However, subsequent authority from the Supreme Court after the cases it held that that language is insufficient included Port Authority, and what Port Authority held was that you look not only at the precise provision that is set out, but you look at the rest of the surrounding provisions of the contract or in the case of Port Authority, it was a venue statute that was used to interpret whether a waiver was sufficient. Here, we think that the reference to the copyright in the context of what Mr. Allen was signing in this agreement, it dealt only with his copyright. And in that context, then the waiver has to mean that you're allowed to sue in federal court because there is no other place to sue. It doesn't even mention immunity. It doesn't even relate to immunity. There's no discussion in the contract of immunity. They just talk about liability and the scope of the agreement, one way or the other. There's a way of immunity, a constitutional sovereign immunity is a pretty serious thing. And the Supreme Court, I mean, we're not just talking about a passing reference. They have made this clear in case after case after case, and they have rejected waivers of all kinds where people have tried to infer, imply, to find them. It has to be explicit. And it's a right of the state, and it's not a right of any official of the state to do it. Well, Your Honor, I would agree with you that they have said it. They have not said that it has to use the word immunity when it says that we can be sued. That's not a waiver of immunity. It is. They've held that again and again. Just to be able to sue somebody doesn't mean you can be a waiver. That's part of the contract. Well, Your Honor, what I would say is that we rely on the Tascadero and court authority, and beyond them we don't have any other authority. Okay, anything else? Well, I would talk, Your Honor, about the Article I issue that he brought up with respect to the constitutionality of the CRCA. That is addressed in our briefs. I think Mr. Oman has explained that the record is very different. If you would like to, I can tell you why the patent statute is so very different from the Copyright Act. Okay, we'll take a look at your brief. Thank you. We'll come down and greet counsel, and then proceed on to the next case.
judges: Paul V. Niemeyer, Robert B. King, Leonie M. Brinkema